IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

HILAROY SHEFFIELD,

     Plaintiff,

v.                            CASE NO. 1:16-cv-351-WTH-GRJ

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("SSDI") and supplemental

security income ("SSI") benefits pursuant to Title II and Title XVI,

respectively, of the Social Security Act. (ECF No. 1.) The Commissioner

has answered, (ECF No. 10), and both parties have filed briefs outlining

their respective positions. (ECF Nos. 21, 24.) For the reasons discussed

below, the Commissioner's decision is due to be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff filed his applications for SSDI and SSI on April 4, 2008, and

April 22, 2008, respectively. (R. 14, 102–03.) In both applications Plaintiff

alleged a disability onset date of March 16, 2007, due to glaucoma. (R. 14, 102–03, 117.) His applications were denied initially and upon reconsideration. (R. 41–61.) Following a hearing on August 20, 2010, an administrative law judge issued a decision unfavorable to Plaintiff. (R. 14–19.) The Appeals Council denied Plaintiff's request for review. (R. 1–5.)

Plaintiff thereafter appealed the final decision of the Commissioner to this Court. On August 14, 2012, this Court issued an order affirming the decision of the Commissioner. (R. 307–18.) On appeal to the Eleventh Circuit Court of Appeals, however, the Eleventh Circuit reversed and vacated this Court's order and subsequent judgment and remanded so the Commissioner could apply the relevant regulatory requirements of Listing 12.05. (R. 319–28.)  The Appeals Council vacated the final decision of the Commissioner on July 14, 2013, and remanded this matter to a different administrative law judge for further proceedings. (R. 329–31.)

On remand, the administrative law judge ("ALJ") conducted a *de novo* video hearing and a supplemental video hearing. (R. 232–69.) The ALJ then issued an unfavorable decision to Plaintiff on January 29, 2015. (R. 215–25.) The Appeals Council thereafter denied Plaintiff's request for review. (R. 202–07.) Plaintiff filed the instant appeal on November 18,

2016. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. §§ 404.1505, 416.905 (2015).[1] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511,

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

*Case No. 1:16-cv-351-WTH-GRJ*

416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a substantial gainful activity, she is not disabled. §§ 404.1520(b), 416.920(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. §§ 404.1520(c), 416.920(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. §§ 404.1520(d), 416.920(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. §§ 404.1520(e)–(f), 416.920(e)–(f). Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. §§ 404.1520(g), 416.920(g).

The burden of proof regarding the plaintiff's inability to perform past

relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2]

## III.  SUMMARY OF THE RECORD

### A.  Medical Evidence

#### 1.  *Mental*

Plaintiff underwent the Wechsler Intelligence Test ("WIT") for Children in 1974 when he was ten years old. (R. 169.) At that time Plaintiff's Verbal IQ Score was an 87, his Performance IQ Score was a 64, and his Full Scale IQ Score was a 74. (*Id.*)

Plaintiff underwent a second WIT in 1978 when he was fourteen

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

years old. (R. 171.) The second WIT revealed a Verbal IQ Sore of 75, a Performance IQ Score of 69, and a Full Scale IQ Score of 70. (*Id.*)

Plaintiff presented to William E. Benet, Ph.D., Psy.D, approximately 49 years later for a consultative psychological evaluation on September 10, 2013. (R. 552–58.) Plaintiff reported not working for the last seven or eight years because of his vision. His last job was in construction, but he was let go after six months because he could not read. He sometimes becomes depressed and feels like crying because of his condition. He has never become so depressed, however, that he needed to seek professional help. Plaintiff also reported sometimes having trouble sleeping, as well as experiencing right shoulder pain.

Plaintiff told Dr. Benet he drinks three to four beers per night, but might drink more if someone visits. Plaintiff reported a prior DUI arrest. He also smokes marijuana, as recently as two or three days earlier, and a half-pack of cigarettes per day.

With respect to daily activities, Plaintiff said he goes to bed around 8:30 or 9:00 p.m., and wakes around 6:30 or 7:00 a.m. After waking he sits on the porch, rakes his yard, and takes the trash out. Plaintiff sometimes watches the news on television and occasionally goes to Sunday school.

Plaintiff has several friends and likes to go fishing.

Upon examination Plaintiff was alert, oriented, quiet, friendly, and cooperative. Eye contact was good but gait and motor activity slow. Plaintiff's speech was minimal but clear, coherent, and relevant. His thinking was organized and goal directed. Plaintiff had accurate perceptions without hallucinations or illusions. Mood was quiet and affect congruent. Plaintiff's attention and concentration were limited but sensorium was intact. "His general presentation and receptive-expressive language skills suggested extremely low intellectual functioning, with correspondingly limited judgment and insight." (R. 554.)

Dr. Benet conducted psychological testing via the Wechsler Adult Intelligence Scale-IV ("WAIS"). Testing revealed an IQ of 70 in verbal comprehension, 73 in perceptual reasoning, 74 in working memory, 59 in processing speed, and a Full Scale IQ of 64.

Dr. Benet noted that Plaintiff's Full Scale IQ score of 64 corresponds to the first percentile for adults the same age and "falls within the extremely low/intellectual disabled range of ability." (R. 555.) Additionally, Plaintiff's processing speed score of 59 would likely be the most negatively impacted by blurred vision due to glaucoma. Plaintiff's history of continuous alcohol

use with a high likelihood of dependence, however, and his cannabis use

may have also negatively impacted his score. Dr. Benet opined that

Plaintiff "will likely have marked difficulty in performing work-related mental

tasks involving understanding, memory and adaption, and moderate to

marked difficulty performing tasks involving sustained concentration,

persistence, and social interaction." (R. 555.)

### 2.    *Physical*

Plaintiff was diagnosed with glaucoma in November 2006. (R. 175.)

The medical records evidence no further eye exams, however, until Plaintiff

presented for a consultative eye examination in January 2009 with Gerald

Hazouri, M.D. (R. 184–87, 196.) At the consultative examination Plaintiff

complained of decreased visual acuity in both eyes. He reported having

been prescribed medication for glaucoma in the past but said he could not

afford the medication. Examination revealed 20/40 and 20/50 visual acuity

in the right and left eye, respectively. With correction, however, Plaintiff

had 20/30 visual acuity in both eyes. Plaintiff's intraocular pressure was 38

mm Hg.

Dr. Hazouri diagnosed Plaintiff with glaucoma and refractive error,

secondary to glaucoma. Dr. Hazouri prescribed eye glasses and eye

drops, noted that treatment could improve Plaintiff's impairment, and recommended Plaintiff follow-up at Shands Hospital at the University of Florida.

Plaintiff reported to the University of Florida Family Medicine Center ("UF Family Medicine") on February 26, 2010, to establish care. (R. 565.) Plaintiff said he had been diagnosed with glaucoma but that he had not been on treatment recently. Plaintiff also reported blurry vision but no double vision. He had no other complaints. Notably, Plaintiff reported no neurological symptoms, such as a lack of dizziness, light-headedness, or headaches. Plaintiff was referred to ophthalmology for a glaucoma evaluation.

Plaintiff later returned to UF Family Medicine on August 2, 2010, for complaints of metatarsal joint pain. (R. 562.) Upon review of symptoms, Plaintiff reported no dizziness or headaches.

Plaintiff began treating with the University of Florida Physicians Eye Center ("UF Eye Center") on August 13, 2010. (R. 198–201.) He reported being diagnosed with glaucoma but that he had not had an eye exam for two years. He was not using any ocular medications at the time. Plaintiff's visual acuity (without glasses) was 20/40 and 20/60 in the right and left

eye, respectively. Plaintiff was assessed with primary open angle glaucoma in both eyes. The doctor gave Plaintiff eye drops and instructed him to use them twice a day. The doctor noted that Plaintiff may need more aggressive intraocular pressure lowering, including possible surgery. Plaintiff was instructed to return for a follow-up in one month.

Plaintiff eventually underwent selective laser trabeculoplasty ("SLT") on both eyes in September 2010. (R. 585.)

A year and a half later Plaintiff returned to the UF Eye Center on March 27, 2012, with complaints of itching and painless decreased vision in both eyes. (R. 572.) He had no other complaints. Plaintiff was not taking any ocular medications. Visual acuity was measured at 20/50 and 20/60 in the right and left eye, respectively. (R. 573.) Samy Hazem, M.D., assessed Plaintiff with glaucoma and pinguecula. (R. 574.) Dr. Hazem noted rising intraocular pressure over the last two years and therefore prescribed Timolol medication for both eyes twice per day.

Plaintiff later reported to the UF Eye Center on March 8, 2013, with complaints of poking pain upon blinking in his left eye. (R. 575, 591.)

Plaintiff admitted he had not used any eye drops as instructed. John Henry Johnson, M.D., assessed Plaintiff with meibomian gland disease and primary open-angle glaucoma. (R. 576, 592.) Dr. Johnson instructed Plaintiff to restart Timolol twice a day in both eyes.

Plaintiff returned to the UF Eye Center on October 24, 2013, for a glaucoma follow-up. (R. 588.) Plaintiff reported that his eyes ached and his vision had been decreasing. He had not, however, used Timolol as directed since his last visit. Examination revealed visual acuities of 20/50 in both eyes. (R. 589.) Jonathan Jan, M.D., assessed Plaintiff with primary open-angle glaucoma, blepharitis, and meibomian gland disease. (R. 590.) Dr. Jan instructed Plaintiff to restart Timolol twice per day in both eyes and prescribed eye drops for blepharitis and meibomian gland disease.

Plaintiff next returned to the UF Eye Center on May 29, 2014. (R. 584.) Plaintiff reported being compliant with Timolol twice per day in both eyes. He complained, however, of an aching sensation in both eyes that lasted for an hour or two. Examination revealed visual acuities of 20/30 and 20/25 in the right and left eye, respectively. (R. 586.) Plaintiff was instructed to continue Timolol twice per day in both eyes and prescribed Xalatan to use in both eyes at bedtime. (R. 587.)

Plaintiff reported to the UF Eye Center for a follow-up with Dr. Hazem on July 17, 2014. (R. 581.) Plaintiff said he had not started Xalatan due to cost. (R. 582.) He also ran out of Timolol several days prior. Plaintiff reported experiencing soreness around his left eye brow for a few hours the day before. The pain, however, had not returned and he had no blurring, redness, or foreign body sensation. Examination revealed increased intraocular pressure. Dr. Hazem refilled Plaintiff's Timolol and discontinued Xalatan. Dr. Hazem noted that the trend of high intraocular pressure with poor medication compliance "make the surgery or trial of repeat SLT a possible and reasonable alternative." (R. 584.)

Plaintiff presented to the UF Eye Center for a glaucoma check on September 4, 2014. (R. 579.) He reported taking Timolol twice per day and Xalatan at bedtime, despite being advised to discontinue Xalatan. Visual acuity was 20/25 and 20/20 in the right and left eye, respectively. Intraocular pressure was 19 and 22. (R. 581.) Dr. Hazem refilled Plaintiff's Timolol and Xalatan and discussed the option of surgery or repeat SLT. Plaintiff indicated he would think about surgery or repeat SLT.

**B.    Opinion Evidence**

### 1.    *Physical - Dr. Puestow*

Eric Puestow, M.D., a non-examining medical consultant, completed

a physical residual functional capacity assessment for Plaintiff in February

2009. (R. 188–95.) Dr. Puestow opined that Plaintiff can occasionally lift

and/or carry 100 pounds or more, frequently lift and/or carry 50 pounds or

more, stand and/or walk for a total of 6 hours in an 8-hour workday, sit for

a total of 6 hours in an 8-hour workday, and otherwise had no pushing or

pulling limitations. Plaintiff had no postural, manipulative, communicative,

or environmental limitations. Other than limitations with respect to field of

vision, Plaintiff had no visual limitations.

### 2.    *Mental - Dr. Benet*

Dr. Benet completed a Medical Source Statement of Ability to do

Work-Related Activities (Mental) on September 13, 2013. (R. 559–61.) Dr.

Benet opined that Plaintiff's alcohol dependence and cannabis abuse

combined with his mild mental retardation affect his ability to understand,

remember, and carry out instructions. Specifically, Plaintiff has moderate

restrictions with respect to understanding and remembering simple

instructions and carrying out simple instructions. He has marked

restrictions with his ability to make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.

Dr. Benet further opined that Plaintiff's alcohol dependence and cannabis abuse combined with his mild mental retardation affect his ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting. Specifically, Plaintiff has moderate restrictions interacting appropriately with the public, supervisors, and co-workers, but marked restrictions responding appropriately to usual work situations and to changes in a routine work setting.

Dr. Benet explained, however, that some improvement in Plaintiff's limitations may be expected with complete and sustained abstinence from alcohol and cannabis.

## C.    Hearing Testimony

At Plaintiff's original hearing on August 20, 2010, Plaintiff testified that he finished the eighth grade but could not read or write very well. (R.

276.) He previously worked as a construction laborer, but his eyes now get blurry from the glaucoma. He first started having trouble seeing the tape measure and walking on a scaffold. (R. 279.)

The high pressure on his eyes gives him headaches three times a day for two or three hours. (R. 277–78.) When he gets the headaches he has to sit down and be quiet. (R. 278.)

At the first hearing on remand on December 2, 2013, Plaintiff said his glaucoma makes his eyes hurt and become blurry and watery. (R. 252.) Sometimes his eyes are blurry all day. Other times his eyes are dry and achy. (R. 252–53.) His eyes affected his ability to do his job because he had trouble making saw cuts and reading the tape measure. (R. 253.) Plaintiff also still gets headaches every other day. (R. 258.)

Plaintiff can do laundry, cook, and clean. (R. 259.) He still drinks three or four beers a day, smokes marijuana every other week, and smokes ten cigarettes a day. (R. 259–60.) His eye doctor told him to quit smoking, however, because smoking would worsen his intraocular pressure. (R. 260.)

Dr. Schaffzin, an ophthalmologist, testified as an expert at the

supplemental hearing on January 7, 2015. (R. 234.) Upon review of the medical evidence, Dr. Schaffzin opined that Plaintiff has bilateral primary open-angle glaucoma, which does not meet the listings. (R. 235.) Dr. Schaffzin further opined that Plaintiff has no work-related limitations from the glaucoma. (R. 235, 238.)

## D.    The ALJ's Findings

The ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2012, but had not engaged in substantial gainful activity since March 16, 2007—the alleged onset date. (R. 217–18.) At step two the ALJ found that Plaintiff has the severe impairments of low intellectual functioning, tobacco abuse, alcohol abuse, and substance abuse (marijuana). (R. 218.) The ALJ found, however, that Plaintiff's glaucoma is not a "severe" impairment as defined in the Social Security regulations. (*Id.*) At step three of the evaluation, the ALJ found no impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listing 12.05 (Intellectual Disability). (R. 218–20.)

The ALJ further found that Plaintiff has the residual functional capacity to perform medium work a defined in 20 C.F.R. §§ 404.1567(b)

and 416.967(b), except that Plaintiff must avoid jobs involving complex tasks. (R. 220–23.) At step four the ALJ found Plaintiff unable to perform any past relevant work. (R. 223.) At step five, however, in light of Plaintiff's age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 224.) Accordingly, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, from March 16, 2007, through the date of the ALJ's decision. (R. 225.)

## IV.  Discussion

Plaintiff argues substantial evidence does not support the ALJ's finding at step three that Plaintiff does not meet the requirements of Listing 12.05(C). (ECF No. 21 at 30.) Specifically, Plaintiff contends his IQ score of 64 and glaucoma-induced headaches meet the requirements of Listing 12.05(C), thereby necessitating a finding that Plaintiff is disabled.

Under step three of the evaluation, a claimant who meets or equals a listing is entitled to disability benefits. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration

requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (citing 20 C.F.R. § 404.1525(a)–(d)). "To 'equal' a Listing, the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Id.* (quoting 20 C.F.R. § 404.1526(a)). The claimant has the burden of proving that his impairments meet or equal a listed impairment by presenting specific medical signs, symptoms, or laboratory tests that meet all of the specified criteria. *Curry v. Astrue*, 650 F. Supp. 2d 1169, 1176 (N.D. Fla. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

At the time of the ALJ's decision on January 29, 2015, Listing 12.05 (Intellectual Disability) required that the claimant's impairment satisfy the requirements in either A, B, C, or D:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70

and a physical or other mental impairment imposing an additional and significant work-related limitation of function; OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>    1. Marked restriction of activities of daily living; or
>    2. Marked difficulties in maintaining social functioning; or
>    3. Marked difficulties in maintaining concentration, persistence, or pace; or
>    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App.1, § 12.05 (effective Jan. 2, 2015).[3] The introductory material to the mental disorders listings clarified Listing 12.05, stating:

> The structure of the listing for intellectual disability (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your

---

[3] On August 1, 2013, the Social Security Administration changed the terminology in Listing 12.05 from "mental retardation" to "intellectual disability." Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01, 2013 WL 3936340, at *46499 (Aug. 1, 2013). The change, however, did not affect how a claim is evaluated under Listing 12.05.  *Id.* at *46500.

physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

20 C.F.R. Part 404, Subpt. P, App.1, § 12.00(A) (effective Jan. 2, 2015).

Proper evaluation of the impairment "must take into account any variations in the level of [the claimant's] functioning in arriving at a determination of severity over time." § 12.00(D)(2).

In this case, the ALJ found that Plaintiff does not meet Listing 12.05(C) because Plaintiff "does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." (R. 219.) Substantial evidence supports the ALJ's finding.

As an initial matter, the ALJ determined Plaintiff meets the introductory paragraph of Listing 12.05 based on Plaintiff's IQ scores. The record discloses three sets of IQ scores: (1) 1974: Verbal IQ of 87, Performance IQ of 64, and a Full Scale IQ of 74; (2) 1978: Verbal IQ of 75, Performance IQ of 69, and a Full Scale IQ of 70; and (3) 2013: a Full Scale

IQ of 64. Four of these scores fall within the 60–70 range as required

under Listing 12.05(C). Plaintiff's IQ scores within the 60–70 range,[4]

therefore, create a rebuttable presumption that he manifested deficits in

adaptive functioning prior to the age of twenty-two. *See Hodges v.*

*Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001) (IQ tests create a

rebuttable presumption that the IQ score was fairly constant throughout

life); *cf. James v. Comm'r, Soc. Sec. Admin.*, 657 F. App'x 835, 838 (11th

Cir. 2016) (substantial evidence supported ALJ's finding that plaintiff with

an IQ score of 65 did not meet Listing 12.05 because plaintiff's daily

activities and behavior showed she had no adaptive deficit).[5]

The ALJ found, however, that Plaintiff does not have an additional

---

[4] Although Plaintiff relies upon the Full Scale IQ of 64—the lowest score—the Social Security regulations do not address which IQ score an ALJ should rely upon when multiple IQ tests have been administered. *See Wilbon v. Comm's or Soc. Sec.*, 181 F. App'x 826, 829 (11th Cir. 2006) (while § 12.00(D)(6)(c) requires use of the lowest score generated by a single test, the regulations do "not address which IQ score an ALJ should rely upon when multiple sets of tests have been administered"). Nevertheless, Plaintiff's reliance upon 64 (as opposed to one of the other IQ scores) makes no difference, as it still falls within the 60–70 range.

[5] In support of the Commissioner's decision, Defendant argues Plaintiff does not meet the introductory paragraph because he failed to establish that he had deficits in adaptive functioning. (ECF No. 24 at 9–10.) This, however, misconstrues the ALJ's analysis. The ALJ noted Plaintiff's IQ scores within the 60–70 range, but concluded that Plaintiff does not have an additional impairment that results in significant work related limitations as required under subsection (C). (R. 219.) The ALJ did not point to anything to rebut the presumption that Plaintiff had deficits in adaptive functioning prior to the age of twenty-two.

impairment that results in significant work related limitations to meet Listing

12.05(C). If an additional impairment is not severe as defined in 20 C.F.R.

§§ 404.1520(c), 416.920(c), the additional impairment will not be found to

impose an additional and significant limitation of function. *Gibbs ex rel.*

*Barris v. Barnhart*, 130 F. App'x 426, 430–31 (11th Cir. 2005); *see Willard*

*v. Colvin*, No. 5:12-cv-03536-JHE, 2014 WL 1664300, at *4–5 (N.D. Ala.

Apr. 25, 2014) (discussing that although the introductory paragraph to

Listing 12.00 previously provided that the second part of Listing 12.05(C)

required something "significant" but less than a "severe impairment" as

defined in step two of the sequential analysis, the introductory paragraph

was modified in 2000 and now equates the second part of Listing 12.05(C)

with a "severe impairment" as intended by step two of the sequential

analysis).

At step two the ALJ determined that Plaintiff's glaucoma was not a

"severe" impairment as defined in the regulations. (R. 218.)[6] Then, in

considering Listing 12.05(C) at step three, the ALJ reiterated that the

evidence does not support a conclusion that [Plaintiff's] glaucoma results in

---

[6] Plaintiff does not challenge the ALJ's findings at step two.

more than minimal work related limitations. (R. 219.) Substantial evidence supports this finding.

For starters, as the ALJ pointed out, Plaintiff's medical records wholly fail to evidence glaucoma-induced headaches. Throughout the duration of treatment, Plaintiff never reported experiencing glaucoma-related headaches (or even unrelated headaches) to any of his providers. Although Plaintiff did report aching eyes in October 2013 and May 29, the records do not disclose that headaches accompanied his aching eyes. Nevertheless, to the extent his report of aching eyes is construed to mean headaches, when Plaintiff first reported aching eyes in October 2013, he admitted that he had not used Timolol twice per day in each eye as instructed at his last visit. (R. 588.) At his next visit in May 2014 when Plaintiff reported still having an aching sensation despite taking the Timolol as instructed, he said the sensation only lasted for an hour or two. (R. 584.)  By July 2014 Plaintiff only reported one occasion of soreness around his left eye brow for a few hours that had not returned. (R. 582.) Thus, even assuming Plaintiff's complaints of aching eyes correlates with his claim that he experiences glaucoma-induced headaches, the medical records evidence infrequent and relatively brief occurrences.

Additionally, despite Plaintiff's glaucoma, none of Plaintiff's treating physicians have ever imposed any limitations that would preclude work activity. *See Arth v. Berryhill*, No. 4:16-cv-00802-JEO, 2017 WL 3386389, at *4 (N.D. Ala. Aug. 7, 2017) (lack of medical source statements from any of plaintiff's treating physicians supported ALJ's decision that despite having bipolar disorder, plaintiff was not precluded from performing work-related activities). And most notably, as the ALJ pointed out, Dr. Schaffzin, an ophthalmologist—who appeared at the hearing and who reviewed Plaintiff's medical records—concluded that Plaintiff had no significant visual limitations, could read print of any size and that Plaintiff's glaucoma does not result in more than minimal work-related limitations. (R. 218–19, 235, 238.)

The ALJ also noted that the medical evidence demonstrates Plaintiff's glaucoma is properly controlled with medication. *See Duval v. Comm'r or Soc. Sec.*, 628 F. App'x 703, 712 (11th Cir. 2015) (medical evidence demonstrating plaintiff's seizures were controlled by medication supported ALJ's finding that plaintiff was not disabled); *Cascio v. Comm'r of Soc. Sec.*, No. 2:15-cv-719-FtM-CM, 2016 WL 7486745, at *8–10 (M.D. Fla. Dec. 30, 2016) (substantial evidence supported ALJ's determination

that plaintiff was not disabled where plaintiff's condition was controlled when she was compliant with her medications). In January 2009 visual acuity was 20/40 and 20/50 in the right and left eye, respectively. (R. 184.) With correction, however, Plaintiff had 20/30 visual acuity in each eye. (*Id.*) Accordingly, Dr. Hazouri prescribed eyeglasses, eye drops, and noted that treatment could improve Plaintiff's condition. (*Id.*) In February 2010, Plaintiff reported blurry vision but admitted he did not comply with treatment. (R. 565.) By August 2010, visual acuity was 20/40 and 20/60 in the right and left eye, respectively. (R. 198.) Plaintiff, however, reported not taking any ocular medications. (*Id.*) Thus, he was again prescribed eye drops to use twice a day. (R. 200.)

After undergoing SLT, visual acuity in March 2012 was 20/50 and 20/60 in the right and left eye, respectively. (R. 572.) Plaintiff again reported not taking ocular medication. (*Id.*) Dr. Hazem therefore instructed Plaintiff to begin taking Timolol twice per day. (R. 574.) At his next follow-up in March 2013, Plaintiff again admitted that he had not used any eye drops. (R. 571, 592.) By October 2013, Plaintiff still had not been compliant with Timolol as prescribed. (R. 588.) Visual acuity in October 2013 was measured at 20/50 in both eyes. (R. 589.)

Eventually, in May 2014, Plaintiff reported beginning Timolol twice per day in both eyes. (R. 584.) Thus, visual acuity was 20/30 and 20/25 in the right and left eye, respectively. (R. 586.) By September 2014, with continued Timolol compliance, visual acuity was 20/25 and 20/20 in the right and left eye, respectively. (R. 579.)

While poverty typically excuses noncompliance with prescribed treatment, the ALJ's decision in this case was not based on a finding that Plaintiff *refused* to follow prescribed medical treatment. *Cf. Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (holding that while refusal to follow prescribed treatment without a good reason will preclude a finding of disability, poverty nonetheless excuses noncompliance). Instead, the ALJ simply pointed to medical evidence that demonstrated how compliance with the prescribed ocular medications controlled Plaintiff's visual acuity.

There is no question that Plaintiff has glaucoma. The mere existence of glaucoma, however, does not reveal the extent to which it limits Plaintiff's ability to perform work related activities. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) (noting that "the mere existence of [varus leg instability and shoulder separation] does not reveal the extent to which they limit [plaintiff's] ability to work or undermine the ALJ's

determination in that regard"). For the foregoing reasons, substantial evidence supports the ALJ's finding that Plaintiff's glaucoma results in no more than minimal work-related limitations. Accordingly, Plaintiff has failed to demonstrate that he meets Listing 12.05(C).

## V. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 14th day of November 2017.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**